**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| GERALD JOSEPH LOVOI, derivatively on behalf of WALGREENS BOOTS ALLIANCE, INC., | ) ) ) | Case No. |
| | ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| TIMOTHY C. WENTWORTH, JANICE M. BABIAK, INDERPAL S. BHANDARI, GINGER L. GRAHAM, BRYAN C. HANSON, VALERIE B. JARRETT, JOHN A. LEDERER, STEFANO PESSINA, THOMAS E. POLEN, NANCY M. SCHLICHTING, MANMOHAN MAHAJAN, RICK GATES, and TRACEY D. BROWN, | ) ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants, | ) ) ) | |
| -and- | ) ) | |
| WALGREENS BOOTS ALLIANCE, INC., a Delaware Corporation, | ) ) ) | |
| Nominal Defendant. | ) ) | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Gerald Joseph Lovoi ("Plaintiff"), derivatively on behalf of Walgreens Boots Alliance, Inc. ("Walgreens" or the "Company"), brings the following complaint against the Company's board of directors (the "Board") and executive officers for breaches of fiduciary duties and violation of Section 14(a) of the Securities Exchange Act of 1934. Except for allegations specifically pertaining to Plaintiff and Plaintiff's own acts, the allegations in the Complaint are based upon information and belief, which include but are not limited to: (i) the Company's public filings with the United States Securities and Exchange Commission (the "SEC"); (ii) pleadings

1

filed in *Bhaila v. Walgreens Boots Alliance, Inc., et al.*, Case No. 1:24-cv-05907 (N.D. Ill.); (iii) corporate governance documents available on the Company's website; and (iv) other publicly available information.

## NATURE OF THE ACTION

1.     This is a stockholder derivative action brought by Plaintiff, a stockholder of Walgreens, on behalf of the Company against the Defendants.  This action alleges breaches of fiduciary duty by the Board and senior executive officers occurring from at least October 12, 2023, and June 26, 2024. During that time the Defendants (as defined herein) caused or allowed Walgreens to issue or make materially false and misleading statements concerning the Company's financial condition and business operations. Additionally, the Defendants caused or allowed Walgreens to file false and misleading statements with the SEC.

2.     On October 12, 2023, Walgreens announced its financial results for its fourth quarter and fiscal year 2023. That day, the Company provided financial guidance for the upcoming fiscal year. The guidance foresaw modest growth in the Company's U.S. Retail Pharmacy segment, which brought in the vast majority of Walgreens's revenues, and specifically the Company expected reimbursement of pharmacy services to be less of an issue, and an increase in prescription volume.

3.     For the next two quarters, Walgreens's executive officers assured investors and analysts that the guidance was in line with expectations. The truth was that the struggling retail stores combined with pressures on reimbursements and prescriptions could not keep up with Defendants' stated expectations.

4.     On June 27, 2024, the Company released its financial results for the third quarter of fiscal year 2024. Along with the results, the Company revealed that it would need to drastically

change its guidance for the year, as well as restructure the U.S. Retail Pharmacy segment.

5.     Through this action, Plaintiffs seek to hold the Board and executive officers accountable for making or causing the Company to make false and misleading statements in breach of their fiduciary duties to the Company.

## PARTIES

### A.     Plaintiff

6.     Plaintiff Gerald Joseph Lovoi is a current shareholder of Walgreens and has continuously held Walgreens stock during all times relevant hereto and is committed to retaining Walgreens shares through the pendency of this action to preserve his standing.  Plaintiff will adequately and fairly represent the interests of Walgreens and its shareholders in enforcing its rights.

### B.     Nominal Defendant

7.     Nominal Defendant Walgreens is a corporation organized and existing under the laws of the State of Delaware. The Company's principal executive offices are located at 108 Wilmot Road, Deerfield, Illinois 60015. Walgreens common stock trades on the Nasdaq Stock Market under the ticker symbol "WBA."

### C.     Individual Defendants

8.     Defendant Timothy C. Wentworth has served as CEO and a director of the Company since 2023.

9.     Defendant Janice M. Babiak has been a director of the Company since 2012.

10.     Defendant Inderpal S. Bhandari has been a director of the Company since 2022.

11.     Defendant Ginger L. Graham has been a director of the Company since 2010. Defendant Graham currently serves as Lead Independent Director of the Board. Defendant Graham

3

previously served as Interim-CEO of the Company from September 1, 2023, to October 22, 2023.

12.     Defendant Bryan C. Hanson has been a director of the Company since 2022.

13.     Defendant Valerie B. Jarrett has been a director of the Company since 2020.

14.     Defendant John A. Lederer has been a director of the Company since 2015.

15.     Defendant Stefano Pessina has been a director of the Company since 2012. Defendant Pessina has served as Executive Chairman since 2021. Previously, Defendant Pessina served as CEO and Executive Vice Chairman of the Company, and as Executive Chairman of Alliance Boots prior to its merger with Walgreens.

16.     Defendant Thomas E. Polen has been a director of the Company since 2023.

17.     Defendant Nancy M. Schlichting has been a director of the Company since 2006.

18.     Defendants Wentworth, Babiak, Bhandari, Graham, Hanson, Jarrett, Lederer, Pessina, Polen, and Schlichting are herein referred to as "Director Defendants."

19.     Defendant Manmohan Mahajan currently serves as Executive Vice President and Global Chief Financial Officer of the Company. Previously, Defendant Mahajan served as Interim Global Chief Financial Officer and Senior Vice President, Global Controller and Chief Accounting Officer for Walgreens.

20.     Defendant Rick Gates has served as Senior Vice President and Chief Pharmacy Officer of Walgreen Co. since March 2023. Defendant Gates previously served as Senior Vice President of Pharmacy and Healthcare.

21.     Defendant Tracey D. Brown has served as Executive Vice President, President of Walgreens Retail and Chief Customer Officer since March 2023. Previously, Defendant Brown served as President, Walgreens Retail and U.S. Chief Customer Officer.

22.     Defendants Wentworth, Mahajan, Gates, and Brown are herein referred to as

"Officer Defendants."

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

24.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

25.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

26.     Venue is proper in this court under 28 U.S.C. § 1391, because Walgreens is headquartered in this District, and a significant amount of the conduct at issue took place and had an effect in this District.

## FURTHER SUBSTANTIVE ALLEGATIONS

### A.     Company Background

27.     Walgreens has offered retail and pharmacy services to communities since it was formed in 1909 as Walgreen Co. In 2014, Walgreen Co. merged with Alliance Boots, forming the current Company. The Company has three business segments: U.S. Retail Pharmacy, International, and U.S. Healthcare. U.S. Retail Pharmacy operates more than 8,000 drugstores throughout the United States. Walgreens's U.S. Retail Pharmacy segment provides pharmacy and healthcare services, including prescription drugs and vaccines, as well as retail products, through the

Company's drugstores. In fiscal year 2023,[1] Walgreens recognized $139 billions of sales, and recognized sales of $132.7 billion in 2022, and $132.5 billion in 2021. Sales in the U.S. Retail Pharmacy segment were $110.3 billion in 2023, $109 billion in 2022, and $112 billion in 2021, or 79.3%, 82.1%, and 84.5% of total sales, respectively. The sale of prescription drugs and provision of pharmacy-related services make up approximately three-quarters of Walgreens's U.S. Retail Pharmacy business, with retail products making up the remaining quarter of sales for the segment. The pharmacy-related products and services provide the majority of the Company's total revenues.

**B.    Walgreens's False and Misleading Statements**

28.    On October 12, 2023, Walgreens issued a press release announcing financial results for fourth quarter and fiscal year 2023, as well as guidance for fiscal year 2024. According to the press release:

**Fiscal 2024 Outlook**

|  | | 2024 |
|---|---|---|
| Sales | $ | 141.0 to $145.0 Billion |
| Adjusted operating income (Non-GAAP measure) | $ | 3.4 to $3.7 Billion |
| Adjusted EPS (Non-GAAP measure) | $ | 3.20 to $3.50 |

For fiscal 2024, Walgreens Boots Alliance expects adjusted EPS of $3.20 to $3.50 reflecting incremental cost savings across the business and accelerating profitability in U.S. Healthcare, more than offset by lower sale and leaseback contribution, a higher tax rate, and lower COVID-19 contribution.

The Company expects U.S. Healthcare adjusted EBITDA to be breakeven at the midpoint of the guidance range of ($50) to $50 million.

29.    Walgreens held a call that day with analysts and investors to discuss the reported financial results. While summarizing the Company's performance, Defendant Mahajan stated:

Now let's move to the U.S. Retail Pharmacy segment. Comp sales growth was 5.7%, reflecting higher brand inflation and mix impacts in our pharmacy business and comp script growth. AOI was down 29.4% in the quarter, reflecting a 27%

---

[1] Walgreens's fiscal year runs from September 1 through August 31.

impact from lower COVID-19 contributions and a 17% impact from lower levels of sale leaseback gains, net of rent. Higher underlying pharmacy gross profit and lower incentive accruals contributed positively to AOI. Let me now turn to U.S. pharmacy.

Pharmacy comp sales increased 9.2% in the quarter, driven by brand inflation and mix impacts and comp script growth.

A weaker-than-normal respiratory season and impact of Medicaid redeterminations resulted in a weaker overall prescription market during the quarter. Third-party market data showed flu, cold and respiratory activity down 35% compared to the prior year quarter. Despite these weaker trends, comp scripts grew 1.6%, excluding immunizations.

We administered roughly 400,000 COVID-19 vaccinations in the quarter down from 2.9 million in the prior year quarter. Excluding the impact of COVID-19, fourth quarter adjusted gross profit increased versus the prior year period.

Turning next to our U.S. retail business. During the quarter, the retail business was impacted by a weaker-than-normal respiratory season and a continued shift in consumer behaviors, driven by a challenging macroeconomic environment. As a result, comparable sales declined 3.3% in the quarter.

There are three main drivers: first, an 80% decline in COVID-19 test kits impacted growth by around 160 basis points; second, weaker cough, cold, flu sales had an approximately 100 basis points impact; and lastly, we were impacted by approximately 60 basis points from summer seasonal weakness, as customers continue to pull back on discretionary spending, reflecting the challenging macroeconomic environment.

Looking at category performance, we saw a decline in health and wellness, while personal care and beauty both grew low single digits. Retail gross margin was impacted by elevated shrink and lower sales in a higher-margin categories, such as cough, cold, flu, seasonal and COVID-19 test kits. Despite the pressure in the second half, gross margin grew by nearly 100 basis points in fiscal '23, on top of a 100 basis point increase in the prior year.

30.     Defendant Mahajan also discussed the guidance for fiscal year 2024, providing more details on the information disclosed in the earnings press release:

I will now turn to our fiscal '24 guidance. We are guiding to fiscal '24 adjusted EPS of $3.20 to $3.50, down from $3.98 in fiscal '23. Before discussing underlying performance, I want to mention some key headwinds that we will face in fiscal '24. These include lower sale and leaseback contributions, a higher tax rate and lower COVID-19 contributions. We're also assuming continued macroeconomic pressure

on the consumer and a weaker respiratory season compared to the prior year. Excluding the impact of these headwinds our forecast assumes underlying growth, which is primarily driven by two factors: First we expect accelerating profitability in our U.S. healthcare business in 2024 as the segment continues to scale, with adjusted EBITDA expected to be at or around breakeven.

Second, we expect U.S. retail pharmacy underlying adjusted operating income to be driven by immediate actions to improve the cost base and modest underlying growth in both retail and pharmacy

*      *      *

U.S. Retail Pharmacy segment sales are projected to be flat to up 2%. AOI will be negatively impacted by approximately 8 percentage points from the lower COVID-19 contributions and roughly 11 percentage points of lower sale and leaseback gains. Excluding these impacts, the underlying business is projected to drive 5% to 10% AOI growth.

I will now take you through the key business drivers. First, we anticipate script volume growth driven by overall market growth. On reimbursement, we have roughly 75% of the contracts signed for calendar year '24. We do expect reimbursement pressure to be less of a headwind in fiscal '24 than in fiscal '23.

We're projecting approximately 5 million COVID vaccinations in 2024. Quarter-to-date, we're well on track and have already administered over 3 million COVID vaccinations. In retail, we expect margins to benefit from our category performance improvement program and a roughly 1 percentage point increase in owned brand penetration.

At the same time, we're adopting a prudent approach. We see a continuation of the challenging trends that impacted the second half of fiscal 2023. We're projecting flat comparable sales due to a milder cough, cold, and flu season year-on-year, lower COVID OTC test kit volume and continued consumer pressure. We're also planning a higher level of shrink, which has been increasing in the last several months and continues to represent a serious systemic issue across the retail industry. Within SG&A, we expect to achieve over $1 billion of cost savings during fiscal 2024, as Ginger has already described.

31.     In response to a question on how prescription reimbursement would impact the U.S.

Retail Pharmacy business, Defendant Gates stated:

Obviously, we saw a weaker end of the fiscal year from market growth, specifically around cough, cold, flu, some of the respiratory and some of the Medicaid redetermination, which shows some lower utilization from consumers.

So the primary driver of the market coming back in line with what the expectations are from IQVIA and others. And so that's really what we've seen as we started into the first quarter of the fiscal year and market is going to be a big underpinning to what we do. But we continue to advance our adherence programs that are really driving incremental script growth, partnering with health plans and others to really drive better adherence. And obviously, that does help on the script side.

You're also going to see some access initiatives, especially going into calendar year '24, which should be some tailwinds for us. I think some changing dynamics in the marketplace or having individuals choose more open access and things that should give us access differently than what we've seen in the past. And the last one would be that we're really focused on potential file buys and opportunities given some of the changes in the marketplace.

So I think there's a bunch of drivers that really give us confidence that we have tailwinds behind us in the script growth.

32.    On January 4, 2024, the Company issued a press release announcing financial results for the first quarter of fiscal year 2024. Walgreens reported sales of $36.7 billion, 10% higher than the first quarter of fiscal year 2023. The Company attributed the increased sales numbers to "sales growth in the U.S. Retail Pharmacy and International segments." No changes were made to the guidance for fiscal year 2024.

33.    Walgreens held a call that day with investors and analysts to discuss the announced financial results. In his opening remarks, Defendant Wentworth stated:

As you are by now aware, WBA started fiscal 2024 with on-plan results despite a weak retail environment in the U.S. First quarter adjusted EPS came in at $0.66, reflecting execution and cost discipline in U.S. Retail Pharmacy, continued strong performance in International and progress with profitability initiatives in U.S. Healthcare. We are maintaining full year adjusted EPS guidance against a challenging backdrop. I must give credit here to the hard work and dedication of our teams. We are navigating the accumulating consumer pressures from inflation and depleted savings and somewhat slower-than-anticipated market trends in pharmacy script volumes, including impacts from a weaker respiratory season and Medicaid redetermination.

Retail customers in the United States are under stress and making deliberate choices to seek value, evidenced in our own brands up 90 basis points in the quarter, while demand for seasonal and discretionary categories remains weak.

At the same time, our teams executed well during the quarter on delivering pharmacy services, including vaccines and maintaining our overall share of script volume in the U.S.

*     *     *

Finally, let me touch on reimbursement models and dynamics. We continue to see the benefits of more comprehensive and responsive discussions with payors as they are realizing the broad set of value drivers that WBA can deliver. We are committed to and entering into pay-for-performance contracts beyond core dispensing as we advance our adherence and outcomes capabilities within our pharmacy platform.

In addition, we welcome and will work with payor and PBM partners on any model that recognizes and reimburses pharmacies for the unmatched value we provide patients, including pharmacy services, as well as those models that can ensure more transparency and predictability in reimbursement.

34.     Defendant Mahajan summarized the Company's performance by stating:

Now I will cover the U.S. Retail Pharmacy segment. Sales increased 6.4% versus the prior year quarter, driven by brand inflation in pharmacy and higher contributions from pharmacy services. Sales growth was partially offset by a 6.1% decline in the retail business.

AOI declined 37.2% year-on-year, mainly driven by lower retail sales volume and margin, including higher levels of shrink. AOI was positively impacted by execution in our pharmacy services and progress on cost savings initiatives.

Let me now turn to U.S. Pharmacy. Pharmacy comp sales increased 13.1%, mainly driven by brand inflation and higher contribution from pharmacy services. COVID-19 vaccines have now shifted to a commercial model consistent with other vaccinations. Comp scripts grew 1.8%, excluding immunizations, in line with the overall prescription market.

The ongoing impact of Medicaid redeterminations and a weaker flu and respiratory season continued to negatively impact overall market growth. Third-party data showed flu, cold and respiratory activity was down 13.5% compared to the prior year quarter.

Within Pharmacy Services, our vaccines portfolio, which includes flu, COVID, RSV and other routine vaccinations, performed well in the quarter. Pharmacy adjusted gross profit declined slightly in the quarter, with margin negatively impacted by reimbursement pressure, net of procurement savings and brand mix impacts.

Turning next to our U.S. Retail business. Challenging macroeconomic conditions

10

and an anticipated slow start to the cough, cold, flu season contributed to a weaker retail performance year-on-year. Comparable sales declined 5% in the quarter.

There are 3 main drivers. First, a weaker respiratory season had an impact of approximately 160 basis points through the health and wellness category. Cough, cold, flu serves as a primary trip driver. As a result, we also experienced lower attachment sales due to the weaker season, which
are incremental to the 160 basis points impact. Second, customers continue to pull back on discretionary spending, and actively seek out promotional opportunities. As a result, we saw an approximately 90 basis points impact from weaker holiday seasonal sales. Lastly, our decision to close most of our stores on Thanksgiving this year to further support our store team members led to a headwind of about 60 basis points.

While these factors resulted in lower sales across all categories, we experienced more pronounced declines in consumables and general merchandise and in health and wellness.

Retail gross margin was negatively impacted by 110 basis points due to higher shrink. Retail shrink continues to be a systemic issue across the retail industry.

35.     Defendant Mahajan also discussed the guidance for fiscal year 2024, providing

more details on the information disclosed in the earnings press release:

I will now turn to guidance. We are maintaining our fiscal '24 adjusted EPS guidance. We expect certain incremental tailwinds and headwinds in a challenging environment compared to our prior outlook.

On the tailwinds, with strong execution to date, we now expect pharmacy services to deliver ahead of our initial plan. We also anticipate an improvement in our full year adjusted effective tax rate as a result of tax planning initiatives, with a revised range of 15% to 17%, compared to the prior outlook of 19% to 20%.

On the headwinds. First, we expect the pullback in consumer spending and shifting behaviors will continue to impact our retail sales in the U.S. in the short term, while improving in the second half. We now expect retail comp sales for fiscal '24 to decline low single digits compared to the prior outlook of flat. Second, we expect approximately $125 million in reduced sale and leaseback gains versus our prior outlook. As we explained in October, this is the last year of anticipated sale leaseback transactions. Lastly, we also forecast slightly lower overall market volume growth for prescriptions compared to our previous expectations.

*       *       *

Looking ahead to the second half of fiscal '24, there are 4 key drivers for our

improving earnings profile. First, as we have previously discussed, we expect actions to lower our cost base will continue to ramp over the year. . . . Third, we cautiously expect modest level of retail market growth against an easier second half comparison.

36.     The analysts on that call sought clarification on the Company's ability to maintain

the profitability of the Pharmacy portion of the U.S. Retail Pharmacy segment:

Lisa Christine Gill - JPMorgan Chase & Co, Research Division - Analyst

I want to go back to your comments around the reimbursement model. You talked about pay-for-performance, you talked about the unmatched value transparency, predictability. How much of that do you think can be driven by Walgreens and Walgreens putting a new model in place? And as we think about just what's happened with the margins in drug retail over a number of years, what do you think can be a sustainable margin when we think about the drug retail business?

Timothy C. Wentworth - Walgreens Boots Alliance, Inc. - CEO & Director

Lisa, first of all, as it relates to sort of how much can Walgreens drive market shift, I think we certainly, as a major retail player and partner to PBMs and health plans, are in a position to bring value to the table in different ways that they will look at and determine -- help them win in their marketplaces. And so I actually think we can play a fairly significant role in the relationships that we have, the contracts that we write and the risk that we're willing to take in terms of the value we know we will create at the back of the store with the way we can interact with patients on behalf of those payors.

So I don't think, as you know, any change in a reimbursement model is a speedy change. But I think there's very, very strong clear messaging in the marketplace from us and others that would point to the fact that the way that retail pharmacies will create value in the next 10 years isn't going to simply be lowering the cost of -- the unit cost of the drugs that we're purchasing and distributing because, quite frankly, that largely now is not where the real gains can be made for payors and for patients.

And so from our standpoint, we're going to drive hard at it. We can work inside of, and we've proven, we're inside of cost-plus models now, transparent models now. We have a very robust cash program. And we think we're a terrific partner to others that want to win in the marketplace with these more innovative models that they have talked about and that they are pushing into the market. So I feel super good.

Now in terms of -- I'm not going to give you guidance on the, as you would expect, on the margins for drugs, other than to say that most of the -- if you look at the innovation and reimbursement in pharmacy that's likely to evolve, it's likely to

evolve in such a way that the margin per drug is going to be largely based on how much service do we provide to patients that's receiving it. And I think we've seen what that looks like in models like specialty. We've also seen, when it disconnects, what it looks like. And those are things that we're working against as well, where we're not compensated for the kind of services we provide.

And we are pretty confident that the value that we can build in what we call our pharmacy services, but also our use of pharmacists to help patients take the drugs and stay on them safely and get the benefits and make sure the payors are getting what they're paying for, we're super well positioned to evolve those models as a leader.

37. Another analyst asked about the Company's ability to recover better reimbursement rates:

Eric R. Percher - Nephron Research LLC - Research Analyst

On pharmacy, we've been hearing from Walgreens the pharmacy services are the key to driving better reimbursement for several years. And it looks like we're seeing that in vaccines today, broader reimbursement pressure continues. And you have a peer saying that you've hit a floor on unit cost offsets. Independents are saying the same and it can't go lower. Do you share the view that we've hit a floor that reimbursement pressure has reached a level you can't go past in '24 or '25? And perhaps more important, given your PBM experience, does Walgreens have the leverage needed to drive more fair reimbursement or new models?

Timothy C. Wentworth - Walgreens Boots Alliance, Inc. - CEO & Director

So listen, in my 25 years at PBM, the floor just kept moving lower, not just for retailers, but frankly, for all the players in the system, right, whether that be rebates or acquisition costs, et cetera. And so we don't accept that -- we think that there is very little left, let's put it that way, in the tank.

In terms of if I'm a PBM and I'm trying to deliver value to my marketplace, the levers that I have include retail network design. And what I -- my point would be is squeezing the retailer beyond sort of where it's economically sensible for the retailer, by itself, there isn't much left there. And so to do that doesn't produce enough value for the PBM to go win on that basis. It's way, way more effective to win on creation of more certainty around value beyond unit costs.

So I think we're close -- I'm not going to say we're close to the floor, but we are in this -- and we've had a very successful 2024 negotiations with the various PBMs and are 95% along the way of being done for '24 and have some good indications for '25. And again, we are -- we believe we can help drive a transition in the marketplace over time to a more value-based model, which will frankly show well

13

to -- through to the end users and the patients.

And so from my standpoint, I'll never declare there's a floor. And as I've said to our team, guess what, we still have to compete. We don't get to not compete just because the reimbursement model changes. We will compete, though, on things that we're actually very good at and that we can control. And I think that as I look forward in the next 3 or 4 years, we can play a leadership role in that in a way that helps PBMs win.

Let me be clear. Our job is to help PBMs win. I want more prescriptions coming through our stores, and that does not happen simply by being a great patient experience. It happens by being a great payor partner. And that's the place that we're going to be focused. And we are listening carefully and trying to understand what are the payors trying to do in order to, therefore, configure the places we create value.

And as you've seen, 2 very large PBMs have said at least -- and I think they're responding, it's really interesting to me, to more pull from the marketplace than we may have experienced historically as it relates to either pass-through or transparent models, and therefore, announcing these programs that they're putting out in the marketplace that we can play very, very effectively in. So the fact that there may be more marketplace pull there only presents for me a sense of urgency for our team to do what we've already done and accelerate additional value creation that we can, A, be paid for, and B, that our payers can go out and win with.

38.     Yet another analyst asked for more information about the Company's ability to change current reimbursement practices. Defendant Wentworth responded:

So how long to implement? As you know, PBM and health plan selling cycles are not short. And so what I would expect is to see material potential change within a year or 2. And probably -- but you'd also see for new sales midyear for small groups and stuff that churns more regularly, I think you could see a fairly quick uptake to the extent that the market is looking for this.

And again, I say that cautiously because we've seen before with transparent -- I remember in 2005, I think, as a PBM, I wrote the -- we joined the Towers Watson collaborative and it was -- we were doing traditional deals within 6 months alongside of the transparent because the market actually didn't want the risk shifted to them. They wanted the risk being held by the PBM.

So in this case though, I think that the plan designs that the market have largely evolved to are creating this underlying demand to give patients the pass-through of the cost plus experience so that they don't have an odd surprise when they go to the pharmacy counter of paying more for the drug than actually they would if they were a cash payor.

14

So I do think that the employers don't like the employees coming into their benefits office asking questions about how good are my benefits, if, in fact -- this is my experience at the pharmacy counter. And that's causing some demand. Again, I'd let the PBM speak for themselves as to why they've launched these programs. But I would suspect that, that's a piece of it. I think as well, the regulatory environment continues to evolve. And I think that it is very appropriately responsive to some of the concerns that exist there.

So I don't think it's going to be -- this is not a 6-month implementation. We are prepared and already have sat down and had conversations to support these models, and we could convert to a cost-plus model overnight. So we are a willing player in terms of what we would need to do to compete and win patients on a cost-plus basis.

Why payers would do it? Again, I think I've just -- I've answered that for you in terms of it comes down to providing a benefit in a labor market that's fairly tough competitive-wise to folks that are valued. And so they want the benefit -- the pharmacy benefits, the most used benefit, they want it to be valued. And they want it to be understood and they don't want it to be confusing. And so I think these models offer a pathway to achieve that.

What's in it for us is being paid fairly for the services we're providing at the back of the store, and not subsidizing in a large-scale way the products that the patients are getting in a way that's not economic for us.

And I think the big change there, if you go back, there was an appropriate amount of incentive being created in the system to dispense generics, for lots of obvious and good reasons. If you go back 25 years ago, the generic wave was -- people didn't believe would happen. We had to do generic sampling in the PBM industry to even convince physicians that they were okay to dispense and easy to dispense.

And so that's different now. You've got 90-plus percent generic dispensing rates in most places. And the need to cross-subsidize and force essentially the profit on to the generic side in exchange for a subsidy on the brand, particularly with the new brands that are coming out, just doesn't work anymore for the pharmacies or, frankly, for the patients in high deductible plans. And so I think those powers will align to force this time a set of changes around reimbursement that may well stick.

39.     In responding to a question about market growth in the pharmacy segment being

lower, Defendant Mahajan stated:

As you think about the prescription market growth, as we shared the outlook in October, our guidance was that we're going to grow in line with market on the prescription side. What we've continued to see in the first quarter is the market is growing at a lower pace. And that's really driven by 2 factors. First is the weaker

respiratory season, and the second is the impact or continued impact of Medicaid redetermination. So as we're thinking about the full year now versus October, we expect the overall market growth to slow down roughly around 50 bps versus previous estimates.

40.     In closing, Defendant Wentworth stated: "We are pleased with our first quarter results, but we recognize we have a lot of work to do. It is still early. The market continues to be, particularly for retailers, challenging. I think we're responding really very well."

41.     On March 28, 2024, the Company issued a press release announcing financial results for the second quarter of fiscal year 2024. Sales increased 6.3% year-over-year to $37.1 billion, and adjusted earnings per share increased 3.4%. Defendant Wentworth stated: "We're encouraged by our first quarter of U.S. Healthcare positive adjusted EBITDA and continued topline growth alongside another quarter of strong execution in pharmacy, as we look to re-energize and evolve its impact both at Walgreens and at large. As we continue to operate in a challenging retail environment, we are taking actions to focus on customer engagement and value." As for the financial guidance for fiscal year 2024, the press release announced:

*Fiscal 2024 guidance*

•     Narrowing fiscal 2024 adjusted EPS guidance to $3.20 to $3.35, reflecting challenging retail environment in the U.S., early wind-down of sale-leaseback program, and lower earnings due to Cencora share sales, offset by execution in pharmacy services and a lower adjusted effective tax rate

•     Maintaining U.S. Healthcare adjusted EBITDA to be breakeven at the midpoint of the guidance range of ($50) million to $50 million

42.     Walgreens held a call that day with investors and analysts to discuss the announced financial results. In his opening remarks, Defendant Wentworth stated:

WBA's second quarter operational results were in line with our expectations despite continued challenges in the U.S. retail environment. Adjusted EPS of $1.20 reflects good execution and cost discipline in our U.S. Retail Pharmacy segment, continued strong performance in International, our first quarter of positive adjusted EBITDA

in U.S. Healthcare and positive impacts from tax planning benefits.

\*      \*      \*

We are narrowing full year adjusted EPS guidance to a range of $3.20 to $3.35. This guidance reflects a challenging retail environment in the U.S. and our decisions to both wind down the sale-leaseback program and to sell additional shares of Cencora in a further effort to simplify our financial reporting.

We expect these impacts to be partially offset by execution in Pharmacy Services and tax favorability.

\*      \*      \*

Moving to Pharmacy. We delivered another quarter of strong execution with outperformance in pharmacy services led by our vaccines portfolio. While market growth was slower than originally anticipated, we maintained market share. Our 11 micro fulfillment centers currently support 4,600 stores, which is over half our footprint. Earlier this year, we talked about pausing the rollout of additional micro-fulfillment centers as we work to optimize the model that gives our pharmacists and technicians the ability to spend more time on customer-facing activities and less time on core dispensing.

We're seeing benefits such as improved NPS scores, patient retention and adherence. Not only is this better for the patient, it improves team member retention and talent acquisition as they perform more of the clinical activities that they are so well trained to do. We are focused on creating an environment that makes us the practice setting of choice for pharmacists.

In fact, earlier this month, we kicked off our first Dean's Advisory Council meeting with the mission of reenergizing and evolving the definition of community pharmacy as demand for pharmacy services increases while the industry faces a pronounced labor shortage. We are on a mission to achieve provider status for our pharmacists given their influence which was so clearly highlighted during the pandemic.

This would allow them to be reimbursed for providing select health care services to patients. These are highly trained clinical professionals just 5 miles or less for most Americans, whose scope of practice goes well beyond dispensing medications and includes immunizations, patient counseling and point-of-care testing for infectious diseases.

As an example of what is ultimately possible, in the U.K., the NHS Pharmacy First Service, which launched on January 31, expands the role of Boots pharmacists throughout England to advise and prescribe for the treatment of 7 common health conditions. This model serves as a use case of new ways to fully deploy

pharmacists' capabilities to lighten the burden on the broader health care system.

Speaking of value, there is real opportunity for change and transparency in reimbursement models to help slow the inflationary pressures on drug prices and our patient's wallets. We already operate in the number of cost-plus and other alternative reimbursement models very successfully and welcome any model that reimburses us for the unmatched value we provide patients.

We are having more active and constructive conversations with PBMs and other payers around cost-plus models. Many of these discussions are still in early stages, but they share a general theme. There is value to all from a transparent, predictable model where what patients pay at the counter is rationally tied to the cost of the drug. We don't expect an industry shift to happen overnight as there are a number of dynamics that need to be worked out, but it's especially encouraging to see PBMs and payers open to these models.

43.     In summarizing the financial results, Defendant Mahajan stated:

Now let me cover U.S. Retail Pharmacy segment. Note that all comparable figures are on a leap year adjusted basis for all segments. Sales grew 4.7% year-on-year driven by brand inflation in pharmacy prescription volume and a higher contribution from pharmacy services, which was partly offset by a 4.5% decline in the retail business.

AOI declined 29.5% versus the prior year quarter due to lower retail sales volume, elevated levels of shrink and lower sale leaseback gains, partially offset by continued progress on cost savings initiatives. Looking ahead, we are winding down the sale leaseback program, and we do not anticipate any material benefit going forward. Sale leaseback gains, net of incremental rent expense, were an approximately $125 million headwind to AOI in the quarter.

Let me now turn to U.S. pharmacy. Pharmacy comp sales increased 8.7%, mainly driven by brand inflation, volume growth and contribution from pharmacy services. Comp scripts grew 2.9%, excluding immunizations, in line with the overall prescription market. The ongoing impact of Medicaid redeterminations continued to negatively impact overall market growth.

Pharmacy Services performed better than expectations, driven by our vaccines portfolio. Pharmacy adjusted gross profit was down slightly versus the prior year quarter with margin negatively impacted by brand mix impacts and reimbursement pressure net of procurement savings.

Turning next to our U.S. Retail business. We continue to see a challenging retail environment with a shift in discretionary spend away from the drug channel as consumers seek value. Comparable retail sales declined 4.3% in the quarter.

There were 3 main drivers. First, as consumers continue to pull back on discretionary spending, we saw an impact of approximately 170 basis points from weaker sales in holiday seasonal and general merchandise categories.

Second, as expected, we saw a weaker than normal respiratory season, which directly impacted comparable sales by approximately 90 basis points. Third-party data showed flu, cold and respiratory activity was down 6% compared to the prior year quarter. In addition, as cough, cold, flu serves as a primary trip driver, there was also an incremental impact from the lower attachment sales.

Lastly, weather conditions in January led to a headwind of approximately 40 basis points in the quarter. Retail gross margin declined year-on-year, impacted by higher shrink partly offset by benefits from category performance improvement program.

*      *      *

I will now turn to guidance. We are narrowing our fiscal '24 adjusted EPS guidance to $3.20 to $3.35. The updated range incorporates a challenging U.S. retail environment, lower sale leaseback gains and reduced Cencora equity income, offset by the execution in pharmacy services and a lower adjusted effective tax rate.

On the tailwinds, we continue to see strong execution in our pharmacy services business, which has delivered results ahead of our initial plan to date. In addition, we now expect our adjusted effective tax rate to be under 5%.

On the headwinds, we expect the challenging retail backdrop will continue to negatively impact our U.S. retail sales in the short term. We now expect fiscal '24 retail comp sales to be down approximately 3%. Second, with the early wind down of the sale-leaseback program, no material
gains are expected in the future.

Third, the block sale of Cencora shares in February will reduce equity earnings going forward. Lastly, as discussed with the first quarter results, we forecast slightly lower market growth in U.S. pharmacy business compared to our initial guidance.

*      *      *

And finally, within our U.S. Retail Pharmacy business, we expect year-on-year improvement in the second half driven by cost savings initiatives.

44.     As with the call held for the previous quarter's financial results, analysts were curious about the Company's ability to impact reimbursement models and increase profitability in the U.S. Retail Pharmacy segment:

Lisa Christine Gill - JPMorgan Chase & Co, Research Division - Analyst

I have a multipart question. I just really want to start with your comments where you talked about boosting profit and growth. You talked about new reimbursement models. You talked about provider status. So you talked about a lot of different things that you think can come into play. Can
you maybe just talk about your line of sight and timing to get there? Would be the first part. . . .

Timothy C. Wentworth - Walgreens Boots Alliance, Inc. - CEO & Director

Thanks, Lisa. A lot there. So I'll take the first part and probably have Rick Gates add a little color. . . .

In terms of new reimbursement models, growth, et cetera, et cetera. Clearly, as we said I think last quarter, we're now just coming into the '25 conversations that are more structured with payers, particularly PBMs as it relates to reimbursement.

And what I would say, which is what I've said in my prepared remarks as well, is we are having very constructive conversations as well as ad hoc conversations with certain payers which continue to lead me to believe and our team to have confidence that there are multiple ways for us to create value for payers and that the pressures on reimbursement -- that there's a clear acknowledgment, let me say it that way, that just playing the way we've been playing for the last 25 years is not going to work.

And I think everyone acknowledges that in the conversation of how we help the PBMs win in their marketplaces with this drive to higher transparency, more member friendliness and so forth, really actually aligns us quite well in those conversations. I don't know, Rick, if you want to take -- add any color to those conversations, your team is obviously very close to them.

Rick Gates - Walgreens Boots Alliance, Inc. - Senior VP & Chief Pharmacy Officer of Walgreen Co.

Yes. Lisa, this is Rick. And I'll just add, we are just in earnest starting up the calendar year '25 negotiations. But I will say you also talked about some of the expanded services. We have gotten traction not only on our adherence based programs and our performance against those to continue to get more adherence based contracts going forward. Vaccines have been a very strong part of what we're doing.

But we're working very closely in the selling cycle right now when it comes to testing, test and treat as we expand those opportunities across the country as well, and that's a state-by-state really process that we're going through until there's a federal provider status, which Tim talked about in his remarks.

45. Defendant Mahajan added his thoughts on how the Company expected to perform in the second half of the fiscal year, stating:

Third, retail business in the U.S., as I shared in my prepared remarks, we have seen headwinds persisting for longer than expected in the U.S. retail environment. And we have lowered our expectation for the second half or for the full year fiscal '24 to a negative 3% comp.

Now within that, we do expect slight improvement over time in the second half as the actions that Tracey and the team are taking will take hold and will drive certain level of improvement. So you have to think about what that is going to be into '25.

And then maybe the last piece on this is our business does have some seasonality. And so pharmacy services business, which has really performed strong throughout the first half, that does generate significantly higher contributions in the first half compared to the second half of the year.

Cough, cold, flu season does have both impact on our pharmacy business in the U.S. as well as on the retail business in the U.S. and the timing of that on a more normalized basis does play out more in the first half than in the second half. And lastly, just on the seasonality piece, another example is Boots, which does have higher contributions in holiday seasons in the first half. So you got to factor those. I just want to make sure you have those themes.

46. Another analyst asked about the Company's strategy on the retail portion of the U.S. Retail Pharmacy segment. In response, Defendant Wentworth stated:

Thanks, Charles. To your second question, we're not prepared today to break that out. Obviously, we build from that. And I think over time, we're going to be looking to give you incremental visibility to key operating metrics that would help you model some of that out. What I can tell you is the vaccine and test and treat and so forth portfolio is very meaningful in terms of our overall back of the store reimbursements and our growth.

If you think about it, it's actually quite amazing, 5 to 10 years ago and let's go 10 years ago, pharma had pretty much abandoned vaccines on a large-scale basis. A lot of the companies had moved away. There was not a strong, strong incremental demand. Today, we see it as one of the key areas of innovation inside pharma companies.

And the exciting part for us that is underappreciated is that in every case, those companies look to their core ability to get to patients as being able to leverage what we do at Walgreens and what our industry does. And we have a unique position in

that the conversations I have with the CEOs of major pharma companies that are driving these innovations suggest to me, that model where we're paid fairly for the work that we do at the back of the store is a model that the future not only needs, but it's going to reward our shareholders.

As it relates to U.S. retail, I'll turn it over to Tracey other than to say -- that is one of a number of key areas for us, the idea of SKU rationalization alongside of growing private label. I think you've got to look at both of those things, and we are moving rapidly on a lot of things. We announced last week a change in store manager compensation for 2024. Initially, that was thought it needed until '25 to get it right, and we found a way to get it done now so that we could unleash the energy of our key field-based leadership in our stores. And so what I've seen is our ability -- and we saw it during COVID, our ability to execute quickly when we've got a goal, when we've got a clear ability to create value is something that I've actually been pleasantly surprised by since I've joined the company.

And Tracy has been leading the -- along with -- I've terrorized a few national brands myself in a few meetings lately, in terms of saying that we're looking for partners, and we aren't going to be a partner to everybody. We want somebody that is going to be everything to us rather than something for everyone.

47.     Defendant Brown added her commentary on the Company's strategy for the retail portion of the U.S. Retail Pharmacy segment:

So as it relates to our own brand expansion, as Tim has indicated, we have been accelerating this at a rapid pace. And if you've been tracking, our own brand penetration has been growing quite nicely.

To your question around how quickly, there are some things that we can do very quickly. One of those, again, Tim mentioned around embracing and incentivizing our frontline team members to really showcase their own brand products and what is important to the consumers in their market.

The second is, in terms of store reach and shelf depth, we can move on those quite quickly. And then the third area is around new product innovation. And this is the part that actually takes a little bit longer. But just to give you a little bit of color, we launched 37 new products in Q2.

And what this means for us is as the consumers' behavior continue to focus on looking at value and finding own brand and being willing to lean into own brand, this is working out quite nicely for us. We are feeling quite good about the level of depth that we can go with own brands.

48.     The last question asked in the call concerned retail growth based on prescriptions.

Defendant Mahajan answered in part:

> If you think about the second quarter, our comp script growth ex-immunization of 2.9%, fairly consistent with where market was, we're holding our share. And as we think about the second half of the year, we expect us to continue to grow in line with the market and hold the share. So that's kind of the expectation we have on the script side.

49.     The foregoing statements were materially false and misleading, and failed to disclose materially adverse facts about the Company's business and operations. Specifically, the statements failed to disclose that the retail portion of the U.S. Retail Pharmacy segment would not experience gains in the second half of fiscal year 2024, and also failed to disclose that the pharmacy portion of that business segment would struggle to sustain growth, particularly in light of continuing issues with reimbursements.

**C.     The Truth is Revealed**

50.     On June 27, 2024, the Company announced its financial results for the third quarter of fiscal year 2024. Adjusted EPS decreased 36.6% from the previous year, which the Company attributed to "a challenging U.S. retail environment, and recent pharmacy industry trends." Defendant Wentworth stated:

> We continue to face a difficult operating environment, including persistent pressures on the U.S. consumer and the impact of recent marketplace dynamics which have eroded pharmacy margins. Our results and outlook reflect these headwinds, despite solid performance in both our International and U.S. Healthcare segments.
>
> Informed by our strategic review, we are focused on improving our core business: retail pharmacy, which is central to the future of healthcare. We are addressing critical issues with urgency and working to unlock opportunities for growth. Many of these actions will take time, but I am confident that we have the right team and the right strategy to lead a business turnaround for the Walgreens that our customers and patients need.

51.     The guidance for fiscal year 2024 was also updated to reflect the impact of pharmacy industry trends on the remainder of the fiscal year:

*Fiscal 2024 guidance*

- Lowering fiscal 2024 adjusted EPS guidance to $2.80 to $2.95 reflecting challenging pharmacy industry trends and a worse-than-expected U.S. consumer environment

*Update on strategic review*

- Finalizing significant multiyear footprint optimization program to close certain underperforming U.S. stores

- Launching U.S. Retail Pharmacy action plan to invest in and deliver an improved customer and patient experience across channels

- Aligning U.S. Pharmacy and Healthcare organizations for enhanced go-to-market capabilities

- Simplifying and focusing the U.S. Healthcare portfolio

52.    Walgreens held a call that day with investors and analysts to discuss the announced

financial results. In his opening remarks, Defendant Wentworth admitted:

> But we also acknowledge where we are today and what we need to do to realize our longer-term ambitions. The severity and duration of the challenges in the operating environment have only added urgency to our strategic and operational review, and we are addressing them directly. Our review has been a significant driver of action as we assess both our existing retail pharmacy business and our collection of strategic assets. I will unpack the series of conclusions we have reached in greater detail after Manmohan, and I review the quarterly results.

> For the third quarter, we delivered adjusted earnings per share of $0.63, reflecting significant challenges in the US retail pharmacy business stemming from a worse-than-expected consumer environment and challenging pharmacy industry trends, partially offset by strength in US healthcare and international. In light of these factors, we are reducing our full year outlook, which Manmohan will take you through in more detail.

> In US retail pharmacy, we witnessed continued pressure on the US consumer. Our customers have become increasingly selective and price-sensitive in their purchases. In response, we invested in targeted promotion and price decisions which have driven traffic and will generate improved customer loyalty, but they weigh on near-term profitability as we refine our approach. We remain relentlessly focused on enhancing the front of store and creating the right omnichannel experience for our customers while driving in-store efficiencies. We also continue to face an incrementally challenging pharmacy industry. Recent trends such as branded mix impacts and increased regulatory and reimbursement pressures,

including fluctuations in NADAC pricing, have negatively impacted pricing dynamics.

Additionally, the script market is growing but continues to trail below pre-pandemic growth levels. These headwinds have affected our performance and are materially weighing on our ability to serve patients profitably.

We are at a point where the current pharmacy model is not sustainable and the challenges in our operating environment require, we approach the market differently. For example, we are in active discussions with our PBM and payer partners to align incentives and ensure we are paid fairly.

We are also working with our suppliers and partnering directly with pharma companies to build out specialty pharmacy, clinical trials, and other services, which Walgreens is uniquely positioned to facilitate, given our physical footprint and the trust we've already established with patients."

*     *     *

As we look ahead to the remainder of the year, we are operating under the following assumptions. We expect the operating environment to remain challenging. We do not expect an improvement in the US retail environment. And finally, we expect script volume growth to remain muted and anticipate continued pressures on pharmacy margins.

In light of these factors, we are reducing our outlook. We now expect to deliver adjusted earnings per share of $2.80 to $2.95 for the fiscal year 2024. While we acknowledge that this range is wider than normal, we believe it is prudent, given fluctuations in recent pharmacy industry trends.

53.     Defendant Mahajan provided a summary of the Company's financial results for the quarter. In doing so, he stated:

Now let me cover US retail pharmacy segment. Comparable sales grew 3.5% year-on-year driven by brand inflation and pharmacy and prescription volume, partly offset by a decline in retail sales.

AOI decreased 48% versus the prior year quarter. Approximately 70% of this decline relates to lower sale-leaseback gains lapping reduced incentive accruals in the prior year and lower Cencora equity income. Challenging retail and pharmacy industry trends also negatively impacted AOI in the current period.

Sale-leaseback gains, net of incremental rent expense, resulted in a $277 million headwind to AOI in the quarter. As discussed, three months ago, we do not anticipate any material benefits from sale-leaseback gains going forward.

Headwinds in the retail and pharmacy businesses were partly offset by cost savings initiatives.

Let me now turn to US pharmacy. Pharmacy comp sales increased 5.7% driven by brand inflation and volume growth. Comp scripts, excluding immunization, grew 1.7% in the quarter. We are tracking in line with the overall prescription market year to date. However, overall prescription market growth remains below expectations primarily due to Medicaid redeterminations.

Pharmacy adjusted gross margin declined versus the prior year quarter driven by brand mix impacts, reimbursement pressure reflecting last year's negotiations, lower COVID testing demand, and incremental pressure from certain generic launches with procurement dynamics similar to brands. Recent fluctuations in NADAC drove an incremental $20 million of the partial quarter impact.

Turning next to our US retail business. Comparable retail sales declined 2.3% in the quarter. As Tim mentioned, the consumer backdrop remains a challenge. With this continued channel shift and a sustained pullback in discretionary spending, we have responded by lowering prices across health and wellness, personal care, and seasonal categories.

Where we invested in price and promotions, we saw returns in sales and unit lift. At the same time, value-seeking behavior and new product launches year-to-date helped to drive our own brand penetration up 65 basis points in the quarter.

While we're seeing early signs of customers responding to our actions, retail gross margin declined more than previously anticipated due to our price and promo investments this year lapping last year's margin recovery actions as well as higher levels of shrink. This was partly offset by positive impact on gross margin from our category performance improvement initiatives, which are tracking in line with our expectations as we deepen relationship with select suppliers.

\*       \*       \*

I will now turn to guidance. We are lowering our fiscal '24 adjusted EPS guidance to $2.80 to $2.95. The updated range versus our expectations three months ago incorporates two key items.

First, the US consumer environment has not improved and is driving higher promotional activity, negatively impacting retail margin. We continue to expect fiscal '24 retail comp sales to be down approximately 3%. Second is the continuation of worse-than-expected pharmacy margin headwinds. Pharmacy margins in the second half include impact from certain generic launches with procurement dynamics similar to brands, fluctuations in NADAC, inflation and mix within branded drugs, and lower overall market growth.

We are maintaining full year expectations for US healthcare segment adjusted EBITDA to be breakeven at the midpoint of the guidance range. We continue to expect our adjusted effective tax rate to be under 5%. Our revised full year guidance range implies fourth quarter adjusted EPS of approximately $0.39 at the midpoint. While we're not providing fiscal '25 guidance today, let me offer key considerations to bridge from fourth quarter to next year.

Seasonality impacts all of our businesses, and the fourth quarter is typically the lowest quarter of the year. Additionally, we expect profitability growth in US healthcare and international segments. However, as Tim mentioned, there are other factors discussed on today's call that we assume will impact fiscal '25. Our decision to wind down the sale-leaseback program, sell Cencora shares, and a more normalized adjusted effective tax rate are expected to have an approximately $0.75 impact in fiscal '25.

In retail, despite easing comparisons, we do not anticipate significant improvement in the US consumer spending backdrop. We are especially seeing signs of strength on the lower-income consumer driven by accumulated inflation and depleted savings. While we're adopting our model, these changes will take time.

We expect to see some pharmacy headwinds continue in fiscal '25. However, we are focused on stabilizing pharmacy margins as we continue to have active discussions with our PBM, payer, and supplier partners. We have more hard work ahead of us, and we are focused on building a solid foundation for the future, driving the stabilization of our business and returning to longer-term enterprise growth.

54.    Defendant Wentworth then described the strategic review undertaken by the

Company:

Before unpacking the details, I want to reinforce the most important conclusion from our review. The retail pharmacy experience will be more important to the healthcare industry in the years ahead, but it will evolve. With widespread demand for convenient healthcare solutions, including chronic diseases, and nationwide labor shortages, the pharmacy and pharmacists have never been
more important. Our retail pharmacy business is uniquely positioned to expand the role we play in the lives of our patients who have come to expect and need retail pharmacy at the center of their care.

So let me begin this discussion around our strategic decisions with our core business, US retail pharmacy. The success of the business hinges on an efficient, highly relevant customer experience, and we've launched a multifaceted action plan for improvement.

As the convenient destination for millions of customers and driving $27 billion of

retail sales, the store and its digital channels are central to our strategy and consumer experience. But the customer has evolved. Demographics and preferences have shifted, and we need to reposition and operate our stores accordingly. Currently, 75% of our US stores contribute roughly 100% of segment AOI. For the remaining 25% of the stores in our network which are not currently contributing to our long-term strategy, changes are imminent.

To start, we are finalizing a multifactor store footprint optimization program, which we expect will include the closure of a significant portion of these underperforming stores over the next three years. Plans to finalize this number are in motion, and we will update you in due course.

For the remaining portion of this cohort, we are taking action to return them to profitability and deliver an improved customer experience. We will contemplate additional closures if performance does not improve, which includes external factors such as reimbursement rates.

While it is not an easy decision to close a store, we will work to minimize customer disruptions. And importantly, as we have done in the past, we intend to redeploy the vast majority of the workforce in those stores that we close.

In addition to these closures, we are taking a series of actions and making investments to enhance the customer and patient experience across several key areas. First, we are reevaluating our assortment to ensure its relevancy, leveraging select partners and our own brands. This means we will work with fewer partners who are helping us win.

For example, in the last quarter alone, we've removed eight national brands and redeployed those SKUs towards own brands and preferred partners within health and wellness categories. We are sharpening our focus as a definition for areas we are uniquely positioned to lead such as health and beauty and women's health.

We are accelerating our digital and omnichannel offerings to meet our customers when, where, and how they want to engage. We continue to deliver approximately 80% of same-day delivery orders within one hour, and we see upside for improvement. As the ultra-convenient option for our over 120 million myWalgreens loyalty members, we have plans to meaningfully build our loyalty program. We are doubling down on our efforts to define the future of pharmacy in this country.

As I mentioned earlier, this starts with changing the dialogue with payers and PBMs to ensure we are paid fairly for the value we provide.

*       *       *

And we're enhancing our pharmacy services like immunizations to attract more patients to an improved experience and enhanced digital solutions. We've

significantly decreased the average wait time per customer in the highest volume stores. And this is a result of several initiatives underway to improve the patient experience and increase retention.

Finally, with a mindset for driving continuous improvement throughout the organization, we are committed to operating with excellence and identifying further efficiencies in both our headquarters and our retail operations. We are restructuring our organization around these conclusions to streamline and ensure efficient development and deployment of services, to go to market as one Walgreens with more impact for our industry partners and to help close critical gaps in delivery of healthcare.

55.     One analyst asked Defendant Wentworth: "what do you view is the future of pharmacy?" Defendant Wentworth replied:

As far as the future of pharmacy, retail pharmacy in particular, which we talk about the store as part of an overall experience, we are working to essentially meet the consumer where they are today and where they need us to be. And there are a number of elements to that, both in the back of the store and in the front of the store.

\*       \*       \*

So a lot there between the front and the back, but you don't need the number of stores we have today. We have a very clear picture of what we need to do there. We will have more details to follow.

**D.      Defendants' Misconduct Has and Continues to Harm the Company**

56.     As a direct and proximate result of the Defendants' conduct, the Company has been harmed and will continue to be. The harm includes, but is not limited to, the costs already incurred and to be incurred defending the Company in the securities class action *Bhaila v. Walgreens Boots Alliance, Inc., et al.*, Case No. 1:24-cv-05907 (N.D. Ill.), as well as costs to be incurred in remediating deficiencies in the Company's internal controls.

57.     Walgreens's reputation and goodwill have also been damaged by the Defendants' misconduct. Analysts have criticized the Company's management and credibility. Ariel Investments, an investment management company, stated in August 2024:

[Walgreens] underperformed following an earnings miss and significant reduction to full year guidance, largely due to continued weakness in its U.S. retail business. . . . Over the medium-term, we expect a re-rating in shares as WBA's new CEO rebuilds the leadership team and earns credibility by executing on previously articulated strategic imperatives as well as margin.

58.     In July 2024, S&P Global Ratings downgraded Walgreens, moving the Company from a credit rating of "Investment Grade" to "Speculative Grade." The Company's new credit rating, BB, indicates that Walgreens "faces major ongoing uncertainties to adverse business, financial and economic conditions," according to S&P Global Ratings. Analysts emphasized that the Company's revised guidance was "notably below" expectations, while the strategic changes announced in June 2024 was a "key" risk to the business. S&P Global Ratings analysts stated their expectation for the Company's S&P Global Ratings-adjusted EBITDA margin to slip more than 100 basis points this year, while Walgreens's debt also presented a significant risk. "We will be monitoring how Walgreens' new management addresses this large debt load closely amid its persistently weak performance and higher interest rates," the analysts stated. "We believe these frequent and large changes to the company's strategic plans diminish management's credibility to execute on a sustainable and cohesive operating model for Walgreens in both the near and long term."

**E.      Walgreens Issues False and Misleading Proxy Statements**

59.     In addition to the false and misleading statements discussed above, the Director Defendants also caused the Company to issue a false and misleading proxy statement during the Relevant Period. The Schedule 14A Proxy Statement issued on December 8, 2023 (the "2023 Proxy") that sought stockholder votes to, among other things, re-elect the Director Defendants to serve on the Board.

60.     The Director Defendants drafted, approved, reviewed, and/or signed the 2023

Proxy before it was filed with the SEC and disseminated to Walgreens's stockholders. Director Defendants negligently issued materially misleading statements in the 2023 Proxy. These allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Director Defendants, and they do not allege or do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference or any allegation of fraud, scienter, or recklessness with regard to the 2023 Proxy allegations and related claims.

61.     In support of re-electing themselves, the Director Defendants highlighted their supposed oversight of the Company. The 2023 Proxy Statement stated:

**Strategy**

As set forth in our Corporate Governance Guidelines, oversight of our business strategy is a key responsibility of the Board. Throughout the year, the Board and its Committees provide oversight and guidance to management regarding our strategy, operating plans and overall performance. While elements of strategy are embedded in every regularly scheduled meeting of the Board, the Board also dedicates at least one multiday meeting each year to focus on our long-term business strategic planning. During fiscal 2023, the Company's business strategy was consistently discussed during executive sessions, as well as during meetings of the Board with management in attendance. In addition to long-term business strategic planning, the Board focused on, among other things, the Company's strategic priorities, including transforming and aligning our core retail pharmacy business, building our next growth engine with consumer-centric healthcare solutions, focusing our portfolio and optimizing capital allocation and building a high-performance culture and winning team.

The Board fulfills its oversight role with respect to strategy, as well as operating plans and business performance, by, among other things:

● Selecting, evaluating, compensating and, as appropriate, replacing the CEO, and planning for their succession;

● Providing advice and counsel to the CEO, including on the selection, evaluation and development of members of the Company's senior management team;

● Overseeing the conduct of the Company's business and strategic plans to

evaluate whether the business is being properly managed;

- Reviewing and approving the Company's financial objectives and major corporate plans and actions; and

- Overseeing the Company's risk management policies and processes designed to promote ethical conduct and legal and regulatory compliance and the processes, controls and procedures implemented to address other significant risks, including cybersecurity/information security and climate-related risks. The Board, primarily through the Finance and Technology Committee, also dedicates significant focus to reviewing our capital allocation strategy. Our current Board-approved capital allocation policy, which is reviewed on an annual basis, is designed to promote a balanced and disciplined approach to deploying capital intended to drive business growth and as needed generate strong returns, while focused on our financial obligations and returning cash to stockholders through dividends over the long term. In addition, the Finance and Technology Committee oversees our technology, digital and innovation strategy, which has an increasing importance and significance to our ability to achieve our strategic goals.

\* \* \*

**Risk management**

We face a broad array of risks, including market, operational, strategic, legal, regulatory, reputational, cybersecurity/data security, environmental, social and financial risks. Our management is responsible for establishing and maintaining systems to manage these risks. The Board exercises oversight over the elements and dimensions of major risks that we face. The Board administers its risk oversight function as a whole and through its Committees.

We have established a global enterprise risk management ("ERM") program, which is led by our Global Chief Compliance and Ethics Officer ("Chief Compliance Officer"). Our Chief Compliance Officer has a dual reporting line to the Chair of the Audit Committee and the Company's Global Chief Legal Officer. Our Governance, Risk and Compliance ("GRC") committee, which is composed of key members of senior management, oversees and monitors the activities of our ERM program and reviews, on a regular basis, the top current and emerging enterprise risks we face, as well as relevant risk mitigation activities. Since the strategic combination of Walgreens and Alliance Boots in 2014, the Company has regularly enhanced the overall ERM program and expanded its scope to align with the Company's business. Currently, in addition to the executive-level enterprise-wide GRC committee, the Company has established similar GRC committees within each of its three business segments. In addition, risk assessments are created by

each business unit and consolidated into segment and Company-level risk assessments and mitigation plans. Our ERM leader meets regularly with senior members of the Company's global leadership team and other members of the Company's oversight and support functions and specific risk owners to help ensure the latest insights and mitigation are incorporated into the Company's risk register.

This global ERM approach helps the Board and its Committees receive relevant information about risks and understand our risk management process, the participants in the process, and key information gathered through the process.

The purpose of the ERM process is to identify risks that could affect us and the achievement of our objectives; to understand, assess, and prioritize those risks; to communicate identified events and risks quickly and effectively to necessary parties across the Company; and to facilitate the implementation of risk management strategies and processes across the Company.

The Board uses the processes described below to help assess and monitor the risks we face. The Board's oversight of risk occurs as an integral and continuous part of the Board's oversight of our business and seeks to ensure that management has processes in place to appropriately manage risk. The Board actively engages with senior management to understand and oversee the various risks we face.

*    *    *

**Audit Committee**

- Reviews our policies and procedures with respect to enterprise risk assessment and risk management

- Regularly reviews, discusses and addresses the key risks identified in the ERM process with management and their potential impact

- Periodically reviews the steps management has taken to monitor and control such risk exposures, including the risk assessment and risk management policies

- Regularly conducts reviews of the efficacy of our information security and technology risks, including cybersecurity, and related policies and procedures

- Regularly reviews and discusses with management major litigation and financial risks

- Regularly reviews and discusses with management legal and compliance matters, including related risks

- Regularly reviews and discusses with management risks related to climate change, sustainability and other ESG-related matters

62.     The 2023 Proxy thus assured stockholders that the Director Defendants understood Company-wide risks, actively oversaw the Company's risks and exposures and steps taken to monitor and mitigate risk exposures. In reality, the Director Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose or prevent the Defendants from causing the Company to make materially false and misleading statements concerning the financial stability of the U.S. Retail Pharmacy segment.

63.     As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to re-elect the Director Defendants to the Board.

**F.      The Board Breached its Fiduciary Duties**

64.     As officers and/or directors of Walgreens, the Defendants owed Walgreens fiduciary duties of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Walgreens in a fair, just, honest and equitable manner. The conduct of the Director Defendants involves a knowing or reckless violation of their obligations as directors and officers of Walgreens, the absence of good faith on their part, and a reckless disregard for their duties to the Company that Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

65.     Defendants, because of their positions of control and authority as directors and/or officers of Walgreens, were able to and did exercise control over the wrongful acts complained of herein. As officers and/or directors of a publicly-traded company, the Defendants had a duty to prevent the dissemination of inaccurate and untruthful information regarding Walgreens's financial condition, performance, growth, operations, financial statements, business, management, earnings, internal controls, and business prospects, so as to ensure that the market price of the Company's

common stock would be based upon truthful and accurate information.

66.     To discharge their duties, the officers and directors of Walgreens were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors and Walgreens were required to, among other things:

a.     Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the Company's stockholders;

b.     Conduct the affairs of the Company in a lawful, efficient, business-like manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.     Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

d.     Oversee public statements made by the Company's officers and employees as to the financial condition of the Company at any given time, including ensuring that any statements about the Company's financial results and prospects are accurate, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

e.     Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions

or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

f.     Maintain and implement an adequate and functioning system of internal controls to ensure that the Company complied with all applicable laws, rules, and regulations; and

g.     Ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules and regulations.

67.     The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its stockholders, which the Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

68.     The Board's Audit Committee is tasked with assisting the Board with its oversight of the integrity of the Company's financial statements, the Company's financial reporting process, and the Company's compliance with laws and regulations. Specifically, according to the Audit Committee's charter, the Audit Committee's responsibilities include:

> <u>Review of Quarterly and Annual Financial Statements</u>. Review and discuss with management and the independent auditor the Company's annual audited financial statements and unaudited quarterly financial statements, including any critical audit matters and disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" prior to filing with the SEC or distribution to stockholders and the public.

*      *      *

Review of Earnings Releases. Discuss with management the Company's earnings press releases, including the use of "adjusted" non-GAAP information, as well as financial information and earnings guidance provided to analysts and rating agencies. Such discussion may be general (consisting of discussing the types of information to be disclosed and the types of presentations to be made).

\* \* \*

Disclosure Controls and Procedures and Internal Control Over Financial Reporting. Periodically review the adequacy and effectiveness of the Company's disclosure controls and procedures and the Company's internal controls over financial reporting, including any significant deficiencies or material weaknesses and significant changes in internal controls.

69. In violation of the Audit Committee Charter, and their general duties as members of the Audit Committee, Defendants Babiak, Bhandari, Jarrett, and Schlichting conducted little, if any, oversight of the Company's internal controls over financial reporting, resulting in materially false and misleading statements regarding the Company's business and consciously disregarded their duties to monitor such controls. The Audit Committee's complete failure to perform their duties in good faith resulted in misrepresentations to the public and the Company's stockholders.

70. In addition, as officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act, the Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information. Accordingly, the Defendants breached their fiduciary duties by knowingly or recklessly causing the Company to make false and misleading statements of material fact about the Company's maintaining adequate internal controls and compliance with applicable rules and

regulations.

71.    The Defendants' flagrant violations of their fiduciary duties and unwillingness to heed the requirements of their company's Code of Ethics and Audit Committee Charter have inflicted, and will continue to inflict, significant harm on Walgreens.

## DERIVATIVE ALLEGATIONS

72.    Plaintiff brings this action derivatively in the right and for the benefit of Walgreens to redress injuries suffered by Walgreens as a direct result of the Director Defendants' breaches of fiduciary duty.  Walgreens is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

73.    Plaintiff will adequately and fairly represent the interests of Walgreens in enforcing and prosecuting the Company's rights.

74.    Plaintiff was a stockholder of Walgreens at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is currently a Walgreens stockholder.

## DEMAND FUTILITY ALLEGATIONS

75.    Plaintiff repeats, re-alleges, and incorporates by reference each and every allegation set forth as though fully set forth herein.

76.    The Walgreens Board currently has 12 members: Robert L. Huffines, William Shrank, and Defendants Babiak, Bhandari, Graham, Hanson, Jarrett, Lederer, Pessina, Polen, Schlichting, and Wentworth.

77.    Plaintiff has not made any demand on Walgreens's current Board to institute this action against the Director Defendants, as any pre-suit demand would be excused. The Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

A. **The Director Defendants Lack Independence Because They Face a Substantial Likelihood of Liability**

78. As alleged above, Defendants Babiak, Bhandari, Graham, Hanson, Jarrett, Lederer, Pessina, Polen, Schlichting, and Wentworth breached their fiduciary duties by negligently issuing the materially false and misleading 2023 Proxy soliciting the reelection of themselves to the Board. Accordingly, Defendants Babiak, Bhandari, Graham, Hanson, Jarrett, Lederer, Pessina, Polen, Schlichting, and Wentworth face a substantial likelihood of negligence liability for issuing the 2023 Proxy and any demand upon these defendants is therefore futile.

79. Defendants Babiak, Bhandari, Graham, Hanson, Jarrett, Lederer, Pessina, Polen, Schlichting, and Wentworth face a substantial likelihood of liability for their individual misconduct. As alleged above, Defendants Babiak, Bhandari, Graham, Hanson, Jarrett, Lederer, Pessina, Polen, Schlichting, and Wentworth breached their fiduciary duties by allowing the Company to issue the materially false and misleading statements described above. Defendants Babiak, Bhandari, Graham, Hanson, Jarrett, Lederer, Pessina, Polen, Schlichting, and Wentworth had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate.

80. In addition, Defendants Babiak, Bhandari, Graham, Hanson, Jarrett, Lederer, Pessina, Polen, Schlichting, and Wentworth owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, Defendants Babiak, Bhandari, Graham, Hanson, Jarrett, Lederer, Pessina, Polen, Schlichting, and Wentworth knowingly and/or with reckless disregard reviewed,

authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices and misrepresented the financial health of Walgreens.

81.     The making or authorization of these false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required due diligence, constitute breaches of fiduciary duties that have resulted in Defendants Babiak, Bhandari, Graham, Hanson, Jarrett, Lederer, Pessina, Polen, Schlichting, and Wentworth facing a substantial likelihood of liability. If Defendants Babiak, Bhandari, Graham, Hanson, Jarrett, Lederer, Pessina, Polen, Schlichting, and Wentworth were to bring a suit on behalf of Walgreens to recover damages sustained as a result of this misconduct, they would expose themselves and their colleagues to significant liability. For this reason, demand is futile as to Defendants Babiak, Bhandari, Graham, Hanson, Jarrett, Lederer, Pessina, Polen, Schlichting, and Wentworth.

**B.      Defendants Pessina and Wentworth are not Independent**

82.     Defendant Wentworth is the CEO of and currently employed by Walgreens. Defendant Wentworth depends on Walgreens for his income. In addition, the Company stated in the Schedule 14A Proxy Statement filed with the SEC on December 8, 2023 that Defendant Wentworth is not independent.

83.     Defendant Pessina is the Executive Chairman of the Board. Defendant Pessina received compensation of $7.5 million in 2023, and $8 million in 2022. Defendant Pessina is married to Ornella Barra who serves as Chief Operating Officer, International, and is an executive

officer of the Company. Ms. Barra received compensation of $5.4 million in 2023, $7.5 million in 2022, and $7.5 million in 2021. In addition, Defendant Pessina's daughter serves as Director of Global Communications Agency Operations for Walgreens and was paid more than $120,000 in 2023. Finally, the Company stated in the Schedule 14A Proxy Statement filed with the SEC on December 8, 2023 that Defendant Pessina is not independent.

### C. Defendants Babiak, Bhandari, Jarrett, and Schlichting are not Disinterested Because They Were Members of the Committee Responsible for Reviewing Earnings Releases

84. The Audit Committee assists the Board with overseeing the integrity of the Company's financial statements and financial reporting process, as well as the Company's compliance with laws and regulations. One of the Audit Committee's responsibilities is to review and discuss with management the annual and quarterly financial statements prior to filing with the SEC or disclosure to investors. Another responsibility of the Audit Committee is to review the Company's earnings press releases, including the financial information and earnings guidance provided to analysts and investors. Defendants Babiak, Bhandari, Jarrett, and Schlichting were members of the Audit Committee during the relevant time period and were thus responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls. Through their knowledge or reckless disregard, Defendants Babiak, Bhandari, Jarrett, and Schlichting caused improper statements by the Company. Accordingly, Defendants Babiak, Bhandari, Jarrett, and Schlichting breached their fiduciary duty of loyalty and good faith because they participated in the misconduct described above. They face a substantial likelihood of liability for these breaches, making any demand on them futile.

85. Based on the facts alleged herein, there is a substantial likelihood that Plaintiff will be able to prove that these individuals breached their fiduciary duties by condoning the misconduct

and failing to take meaningful action to remedy the resultant harm.

## CLAIMS FOR RELIEF

### COUNT I
### Breach of Fiduciary Duty
### (Derivatively Against The Director Defendants)

86.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

87.     Each of the Defendants owed and owes Walgreens the highest obligations of loyalty, good faith, due care, and oversight.

88.     Each of the Defendants violated and breached their fiduciary duties of loyalty, good faith, candor and oversight to the Company.

89.     The Director Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. In breach of their fiduciary duties, the Director Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

90.     In addition, the Director Defendants further breached their fiduciary duties owed to Walgreens by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact and allowing the Company to operate with inadequate internal controls which resulted in the misrepresentations and failure to disclose that the retail portion of the U.S. Retail Pharmacy segment would not experience gains in the second half of fiscal year 2024, and also failed to disclose that the pharmacy portion of that business segment would struggle to sustain growth, particularly in light of continuing issues with reimbursements. The Director Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact, exposing them to personal liability to the Company for breaching their fiduciary

duties.

91.     The Director Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the wrongdoing set forth herein and to fail to maintain adequate internal controls. The Director Defendants had actual knowledge that the Company was engaging in the wrongdoing set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the wrongdoing and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Director Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

92.     As a direct and proximate result of the breaches of duty alleged herein, Walgreens has sustained and will sustain significant damages.

93.     As a result of the misconduct alleged herein, these Defendants are liable to the Company.

94.     Plaintiff, on behalf of Walgreens, has no adequate remedy at law.

## COUNT II
## Breach of Fiduciary Duty
## (Derivatively Against the Officer Defendants)

95.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

96.     The Officer Defendants are executive officers of the Company. As executive officers, the Officer Defendants owed and owe Walgreens the highest obligations of loyalty, good faith, due care, oversight, and candor.

97.     The Officer Defendants breached their fiduciary duties owed to Walgreens by

willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact, failing to disclose that the retail portion of the U.S. Retail Pharmacy segment would not experience gains in the second half of fiscal year 2024, and also failed to disclose that the pharmacy portion of that business segment would struggle to sustain growth, particularly in light of continuing issues with reimbursements. The Officer Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact.

98.     As a direct and proximate result of the breaches of duty alleged herein, Walgreens has sustained and will sustain significant damages.

99.     As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

100.    Plaintiff, on behalf of Walgreens, has no adequate remedy at law.

### COUNT III
### Violation of Section 14(a) of the Exchange Act
### (Against the Director Defendants)

101.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

102.    The section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. The section 14(a) Exchange Act claims detailed herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

103.    The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained

in the 2023 Proxy. In the 2023 Proxy, the Board solicited stockholder votes to reelect the Director Defendants to the Board.

104. The 2023 Proxy, however, misrepresented and failed to disclose the Board's risk oversight and the Company's inadequate internal controls, which facilitated the illegal behavior described herein. By reasons of the conduct alleged herein, the Director Defendants violated section 14(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, Walgreens misled and deceived its stockholders by making materially misleading statements that were essential links in stockholders following the Company's recommendation and voting to reelect the Director Defendants.

105. Plaintiff, on behalf of Walgreens, thereby seeks relief for damages inflicted upon the Company based upon the misleading 2023 Proxy in connection with the improper reelection of the Director Defendants to the Board.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands judgment as follows:

A. Declaring that Plaintiff may maintain this derivative action on behalf of Walgreens and that Plaintiff is a proper and adequate representative of the Company;

B. Against all of the Defendants and in favor of Walgreens for the amount of damages sustained by the Company as a result of the acts and transactions complained of herein;

C. Granting appropriate equitable relief to remedy the Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

D. Awarding Walgreens restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

E.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

F.    Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: September 27, 2024                   Respectfully submitted,

/s/ Timothy P. Kingsbury
*One of Plaintiff's Attorneys*

**KINGSBURY LAW LLC**
Timothy P. Kingsbury
8 S. Michigan Ave., Suite 2600
Chicago, IL 60603
Telephone: (312) 291-1960
Email: tim@kingsburylawllc.com

*Counsel for Plaintiff*

**GLANCY PRONGAY & MURRAY LLP**
Brian P. Murray (*pro hac vice* forthcoming)
230 Park Avenue, Suite 358
New York, NY 10169
Telephone: (212) 682-5340
Email: bmurray@glancylaw.com

*Counsel for Plaintiff*

**ROWLEY LAW PLLC**
Shane Rowley (*pro hac vice* forthcoming)
Danielle Rowland Lindahl (*pro hac vice* forthcoming)
50 Main Street, Suite 1000
White Plains, NY 10606
Telephone: (914) 400-1920
Email: srowley@rowleylawpllc.com
       drl@rowleylawpllc.com

*Counsel for Plaintiff*

## **VERIFICATION**

I, Gerald Joseph Lovoi, am the named plaintiff in the foregoing derivative action. I have read the foregoing Verified Stockholder Derivative Complaint, know the contents thereof, and authorized its filing. The contents alleged therein are true to my own knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters, I believe them to be true. I further declare that I am a current holder, and have been a holder, of Walgreens Boots Alliance, Inc. common stock during the time period in which the wrongful conduct alleged and complained of occurred.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 26th day of September, 2024.

Gerald Joseph Lovoi